Commonwealth *v.* Negri, Appellant.

22

Argued January 7, 1964. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Leonard L. Ettinger,* with him *Manfred Landau,*
and *Ettinger, Gallagher & Silverman,* for appellant.

*Edmund Pawelec,* Assistant District Attorney, with
him *Richard A. Sprague* and *Arlen Specter,* Assistant
District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First
Assistant District Attorney, and *James C. Crumlish,*
*Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 17, 1964:

Charles Negri, the appellant, after trial was found
guilty by a jury of murder in the first degree. The
penalty was fixed at life imprisonment. Following the
denial of post trial motions and imposition of sentence,
an appeal to this Court was filed.

The facts established by the evidence may be fairly
briefed as follows:

On November 11, 1961, Negri and one James Lena-
han escaped from Leesburg Prison Farm in New Jer-

sey, where they were under penal confinement. They traveled to the City of Philadelphia, Pennsylvania, rented an apartment under fictitious names and went into hiding. Shortly thereafter, they devised a plan to rob a bank in Westville, New Jersey. To help carry out the plan, the services of others were obtained, namely, Ethel Nielsen, Vito Belfiore and Romeo Mercantini. The details were discussed and rehearsed.

On December 4, 1961, by prearrangement, Negri, Lenahan, Belfiore, Nielsen and Mercantini met on a parking lot behind a diner located near the bank. According to plan, Nielsen and Mercantini remained on the lot in two separate automobiles which they were to drive in the getaway. Negri and Lenahan, well armed, proceeded to the bank in a third car driven by Belfiore. They held up the bank and seized a substantial sum of money. When they arrived back at the parking lot, it was discovered that Mercantini, for some unknown reason, had disappeared. The four others in on the job then fled from the area in the Nielsen car, to the Nielsen home located only minutes away. There, the loot was counted and its division discussed. Lenahan insisted that Mercantini had run out on the gang, was a "weak link" and in order to prevent a double-cross should be liquidated. The defendant described the conversation in this way: "After we counted the money in Ethel's house . . . Jimmy said to me . . . that Goo-Goo [Mercantini] was the weak link and that if I didn't kill him that he would have to, and it was easier for me because I drove around with him. Later when I spoke with Jimmy on the phone I told him that I was going to meet Goo-Goo at seven o'clock and he told me to remember what I had to do. I knew what he meant, that I was supposed to kill him at seven o'clock when I met him at the apartment."

Later in the day, Negri talked to Mercantini by phone from the Neilsen home and arranged to meet him in the Philadelphia apartment at seven o'clock in

the evening. Nielsen then drove Negri to Philadelphia. When Mercantini arrived at the apartment, he demanded his promised share of the loot. Negri informed him that Lenahan was still in possession of the money and no division had been made. Negri then phoned Lenahan and arranged to meet him at a certain tavern in Philadelphia about 11:30 p.m. Negri told Mercantini to meet him around midnight on a back street nearby.

Around midnight, Mercantini arrived at the appointed place and sat behind the wheel in his parked automobile. Negri joined him in the front seat, informed him he was not going to receive any of the bank money, and shot him twice with the gun he had used in the bank holdup.[1] He then ran back to the tavern where Lenahan, Belfiore and Nielsen were waiting and informed Lenahan, "that thing you wanted done, is done." It was then that Negri received his share of the robbery proceeds. He immediately left the tavern, with Belfiore entered an automobile driven by Nielsen, and was taken to New York City.

The shots were heard by two nearby residents. The police were notified, arrived on the scene within minutes and found the dead body of Mercantini slumped in the driver's seat of his automobile.

Later the same day, December fifth, Belfiore was taken into custody in New Jersey and detained in the Gloucester jail. That night about nine-thirty o'clock, while being questioned by police officers from Philadelphia, Pennsylvania, and Camden, New Jersey, he told of Negri's connection with the bank holdup, gave them sufficient facts to lead to the belief that Negri

---

[1] One bullet entered the right side of the neck below the ear. The second entered the body below the right shoulder, went through vital organs and exited through the front of the body. Either wound would have caused instantaneous death.

had killed Mercantini, and was registered under an assumed name at a certain hotel in New York City.

Some of the above officers left immediately by squad car for New York City. Others were directed to return to Philadelphia, obtain a warrant, and then proceed to New York City with the warrant after word was relayed that Negri had been apprehended. When the former arrived at their destination, they immediately notified New York City police of their presence and purpose, and accompanied by some New York police officers proceeded to the hotel, arriving there about 2:55 o'clock a.m. on December sixth.

They obtained a key from the night clerk and entered Negri's empty room. Within minutes thereafter, Negri arrived and was placed under arrest. He was stripped of his clothing, handcuffed, and his clothing searched, after which he was permitted to redon his clothing. The room was then searched and disclosed the gun, fully loaded, used in the holdup and killing, hidden in the webbing of the bottom of a chair. A substantial sum of money was also found.

From the hotel, he was taken to a nearby police precinct. The New York authorities filed a formal complaint charging him with possession of a gun without a license. Officers from Philadelphia arrived about 9:30 a.m. with a warrant charging Negri with murder and with being a fugitive from justice. He was informed of the charges, questioned for about two hours, but refused to answer any questions.

At two o'clock in the afternoon of the same day, he was taken before a magistrate where he expressed a willingness to return to Philadelphia and face the charges. The magistrate explained the seriousness of the listed offenses and appointed counsel to confer with and assist him. After Negri conferred privately with his counsel, the latter informed the magistrate that Negri desired to return to Philadelphia. He was im-

mediately taken before a general sessions judge in New York City, before whom he signed and acknowledged a waiver of extradition.

Accompanied by Philadelphia officers, Negri left New York City for Philadelphia on the five o'clock train. He slept or dozed during most of the trip. Just before the train arrived at the Philadelphia station, he awakened and asked one of the officers, "Did Vito [Belfiore] blow the whistle on me?" Upon being informed that this was so, he said, "All right. I'll tell you when we get back to city hall."

The party arrived at the Philadelphia detective headquarters about seven o'clock in the evening. Beginning at 7:30 o'clock p.m., Negri made a statement detailing his version of the facts and circumstances incident to the bank holdup and the killing. He claimed that he had no intention of killing Mercantini and the gun was accidentally discharged in a struggle over its possession. The statement was recorded on a typewriter. When it was completed about nine o'clock, he read it and suggested certain changes and corrections. When these were made, he initialed them and signed the statement.

The sufficiency of the evidence to sustain the conviction is not questioned, but it is argued that trial errors and the denial of certain constitutional guarantees require the grant of a retrial. It is first urged that the defendant was deprived of his rights under the Sixth Amendment to the United States Constitution, when upon his arrest he was not immediately given the services of counsel, particularly, before being questioned by the police.

There is no legal or constitutional requirement that a defendant or one suspected of the commission of a crime be afforded counsel immediately upon his arrest, before or while he is being questioned by the police: *Commonwealth v. Agoston*, 364 Pa. 464, 72 A. 2d 575

(1950); *Commonwealth v. Graham,* 408 Pa. 155, 182 A. 2d 727 (1962); *Commonwealth v. Senk,* 412 Pa. 184, 194 A. 2d 221 (1963); *Commonwealth ex rel. Maisenhelder v. Rundle,* 414 Pa. 11, 198 A. 2d 565 (1964); *Begalke v. United States,* 286 F. 2d 606 (1960); *Cicenia v. LaGay,* 357 U.S. 504, 78 S. Ct. 1297 (1958); *Crooker v. California,* 357 U.S. 433, 78 S. Ct. 1287 (1958).

The cases of *Powell v. Alabama,* 287 U.S. 45, 53 S. Ct. 55 (1932); *Hamilton v. Alabama,* 368 U.S. 52, 82 S. Ct. 157 (1961); and *White v. Maryland,* 373 U.S. 59, 83 S. Ct. 1050 (1963), cited in support of appellant's argument in this respect, are inapposite and do not apply.

The only function counsel could provide at such a time would be to instruct his client to keep his mouth shut. If due process requires that the state provide a person with counsel from the very moment of arrest, then the next logical step is to prohibit the police from ever questioning individuals suspected of or charged with crime. Such a rule would be unsound, unrealistic and in complete disregard of the rights of all citizens to be protected from crime and criminals. Due process rightly requires the protection of those accused of crime from any unfair advantage. This Court has great respect for the constitutional rights of an individual, and has always exacted fair and proper conduct which respects constitutional safeguards of individuals charged with crime. By the same token, we do not think that any coddling is required or unreasonable road blocks should be placed in the path of public officials to help criminals escape detection and prosecution.

The validity of the confession on the basis of involuntariness is not here questioned. Moreover, a reading of the record leads to the inescapable conclusion that the statements of the appellant were willingly

given. However, coercion is asserted on the sole basis that counsel, although requested, was denied before the interrogation. That such a request was made is categorically denied by the police officers. In view of the verdict, the Commonwealth must be given the benefit of all favorable testimony: *Commonwealth v. Gockley,* 411 Pa. 437, 192 A. 2d 693 (1963). In addition, the defendant was given counsel in New York City and permitted to ask his advice without restrictions. His trial testimony that he requested counsel before interrogation in Philadelphia lacks credence. But assuming this is true, it would not in itself invalidate the confession, nor constitute coercion: *Crooker v. California,* supra.

Appellant next argues that the confession should not have been admitted in evidence because before the interrogation he was not advised of his constitutional right to remain silent and also was not advised that his statements could and would be used against him.

This objection was not voiced at trial. The introduction of the statement was not objected to on this ground. The only objection entered was to that portion of the statement that detailed his involvement in other crimes. Where the reason upon which an objection is based is specifically stated, as was done in this case, all other reasons for exclusion are waived: *Commonwealth v. Raymond,* 412 Pa. 194, 194 A. 2d 150 (1963). Nor does the record indicate that this question was raised post trial in the court below. Under our long established rules of procedure, appellant is precluded from raising the question for the first time on appeal: *Mantz v. Rufft,* 403 Pa. 436, 170 A. 2d 101 (1961).

Additionally, appellant's past history clearly indicates that he is not one totally ignorant of his legal rights. His refusal to answer questions while in custody in New York is strong evidence of his awareness

of his right to remain silent. Nevertheless, the admonitions under discussion are advisable and important considerations in determining if prejudicial statements are the free choice of the maker. However, this question is not here raised. That his statements were given voluntarily is not questioned. Under such circumstances, the neglect of police officials in failing to admonish an accused before listening to his version of the occurrence does not render his statements inadmissible: See, *Commonwealth v. Charles Mosler,* 4 Pa. 264 (1846); *Commonwealth v. Cavalier,* 284 Pa. 311, 131 A. 229 (1925); *Commonwealth v. Dilsworth,* 289 Pa. 498, 137 A. 683 (1927); *Commonwealth v. Johnson,* 372 Pa. 266, 93 A. 2d 691 (1953). See also, *Commonwealth v. Bryant,* 367 Pa. 135, 79 A. 2d 193 (1951), and *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728 (1956).

Appellant next questions the validity of the arrest and search of his hotel room, both of which transpired without a warrant. It is urged that they were without authority in law and any evidence obtained as a result thereof should have been excluded.

No pretrial motion to suppress this evidence was filed as required by the rules of the Philadelphia courts. Moreover, the law is established beyond argument that a search which is incident to a lawful arrest is valid and reasonable even though conducted without the prior issuance of a search warrant: *Commonwealth v. Gockley,* supra; *Commonwealth v. Cockfield,* 411 Pa. 71, 190 A. 2d 898 (1963); *Abel v. United States,* 362 U.S. 217, 80 S. Ct. 683 (1960); *Wilson v. Schnettler,* 365 U.S. 381, 81 S. Ct. 632 (1961); *Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623 (1963). The practicability of first having obtained a search warrant is not controlling where the search is justified as incident to an arrest: *United States v. Rabinowitz,* 339 U.S. 56, 70 S. Ct. 430 (1950), and *Ker v. California,* supra. "The

lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' Brinegar v. United States, 338 U.S. 160, 175-176 (1949), quoting from Carroll v. United States, 267 U.S. 132, 162 (1925):"[2] *Ker v. California,* supra, at 34, 35. Clearly, the information given the police by Belfiore, a co-conspirator in the bank holdup, who was present when Lenahan insisted upon the victim's liquidation, and also present when Negri returned from the killing and informed Lenahan that the matter had been taken care of, furnished ample grounds and was sufficiently trustworthy to form reasonable belief and probable cause. Important factors to be considered in determining the practicability of the officers first having obtained a warrant are: the time of night of the arrest, and the need for haste to capture a dangerous felon who was already in the process of flight.

It is next insisted that the lawfulness of the appellant's arrest, even if based on probable cause, was vitiated by the mode of entry. It is submitted that the lawfulness of the arrest must be determined in reference to the law of New York State, and under §178 of its criminal code, an officer must announce his office and purpose before entry through breaking in. First, it is apparent that any such announcement would have been a futile gesture since the room was empty when the officers arrived. Again, assuming that the offi-

---

[2] This is in conformity with the New York State standards authorizing an arrest when a felony has in fact been committed, and the arresting officer has reasonable cause for believing that the person to be arrested has committed it. Cf. New York Criminal Code, §177.

cers' entry, by use of a key obtained from the hotel clerk, is the legal equivalent of a "breaking in," it has been recognized from the early common law that a "breaking in" without prior announcement is permissible in executing an arrest under certain circumstances. See, 4 Wharton's Criminal Law and Procedure, §§1624, 1625 (1957), and *Ker v. California,* supra. Here justification for the officers' mode of entry was emphatically present. Involved was a well-armed fleeing felon whom the officers had every right to believe would not be taken without a fight. That they were in serious peril cannot be questioned. The danger would be increased had entrance been demanded or purpose announced. A decision had to be made quickly on the basis of the facts then before them. Under such circumstances, the method of entry was not unreasonable when viewed either under state law or constitutional standards.

The legality of the arrest is also questioned because it is asserted that the arresting police officers failed to announce at the time of taking the defendant into custody the precise charges for which he was being arrested. Again, this question was not specifically raised in the court below and is here presented for the first time on appeal. As noted before, we do not consider questions not raised below. However, the following should be pointed out. There is no doubt that the defendant knew when he was taken into custody that the men involved were police officers. In fact, in his testimony at trial, he mentioned previously knowing one of the individuals as a police officer in New Jersey. Under Pennsylvania law, when it is reasonably apparent that the defendant at the time of the arrest knows that the arresting officers are police officials, the validity thereof is not destroyed merely because the defendant is not informed of the officers' intention to make an arrest, or the cause thereof. See, 1 Varon,

Searches, Seizures and Immunities, page 76; *Shovlin v. Commonwealth,* 106 Pa. 369 (1884); *Commonwealth v. Long,* 17 Pa. Superior Ct. 641 (1901). As stated in *Long* at 647: "The necessity for giving notice to the fleeing felon, and the character of the notice, depends entirely upon the special facts attending the arrest. While in most cases it may be prudent for the officer to give the notice before making the arrest, it is going too far to say in effect that he is required to do so: Shovlin v. Commonwealth, 106 Pa. 369. A warning or notice of arrest might, in some cases, be imperatively required, in others it would be of no avail, and not necessary in order to protect the officer or the private person who immediately pursues a known felon." Flight not only consists in the act of leaving the jurisdiction, it also includes continued concealment to avoid arrest and prosecution: *Commonwealth v. Fusci,* 153 Pa. Superior Ct. 617, 35 A. 2d 93 (1943); *Com. v. Myers,* 131 Pa. Superior Ct. 258, 200 A. 143 (1938).

We recognize that since the arrest was made in New York the law of that state controls in evaluating the legality of the arrest.

Appellant contends that, under §180 of the New York Criminal Code, notice of the authority of the officer and cause of the arrest are mandatory where a warrant is absent. While this is the general rule, there is some doubt that failure to obey the command of §180 voids an arrest to the extent of making seized evidence inadmissible. See, *Squadrito v. Griebsch,* 1 N.Y. 2d 471, 154 N.Y.S. 2d 37, 136 N.E. 2d 504 (1956). Further, §180 specifically states that notice is not mandatory where an arrest (without warrant) is made in pursuit of an escaped felon. Also, it has been ruled that if an accused is effectively informed of the cause of the arrest within a reasonable time thereafter, or if the attending circumstances manifestly suggest that the accused knows why he is taken into custody, the

failure to give explicit notice at the time does not void the arrest. See, *People v. Coffey,* 12 N.Y. 2d 443, 240 N.Y.S. 2d 721, 191 N.E. 2d 263 (1963), and *People v. Coffey,* 36 Misc. 2d 67, 232 N.Y.S. 2d 545 (1962). In determining if the accused had sufficient notice or knowledge of the cause of his capture and arrest, "the whole picture" must be considered. See cases cited above. In the present case, one would necessarily be quite naive to conclude that the defendant lacked knowledge of why he was taken into custody.

Complaint is also made that several officers were in the hotel room when the arrest was made. Also that the defendant was handcuffed and stripped while his clothing was searched. This position certainly fails to face the facts. The police officers were not dealing with a boy scout or one who might be involved in crime due to unfortunate circumstances. As noted before, they were seeking to apprehend, without dire consequences, a seasoned and potentially highly dangerous criminal. Under the circumstances, the cautionary conduct employed was reasonable and dictated by plain common sense: *Commonwealth v. Duerr,* 158 Pa. Superior Ct. 484, 45 A. 2d 235 (1946).

Lastly, it is argued that the trial court erred in permitting rebuttal, showing the prior criminal record (in the form of official records) of the defendant before the jury had deliberated and reached a verdict as to the defendant's guilt or innocence. This evidence of prior convictions of the defendant for breaking and entering, receiving stolen goods and bank robbery was offered and admitted solely for the purpose of impeachment. This was perfectly proper after the defendant had taken the stand in his own defense: *Commonwealth v. Butler,* 405 Pa. 36, 173 A. 2d 468 (1961); *Commonwealth v. Snyder,* 408 Pa. 253, 182 A. 2d 495 (1962).

., After a very careful examination of the record, we are convinced that the assignments of error are devoid of merit and that the court below correctly dismissed the motion for a new trial. The defendant received a fair trial. The trial judge carefully protected his rights at all times and defined the issues for decision by the jury in a thorough and impartial manner. The evidence is more than sufficient to sustain the verdict. The ability and dedication of defendant's counsel, undoubtedly, saved him from the imposition of a more severe penalty.

Judgment affirmed.