Raymond PALMER, Appellant,

v.

C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.

No. 9609.

United States Court of Appeals
Fourth Circuit.

Argued May 6, 1965.

Reargued Jan. 5, 1966.

Decided April 6, 1966.

Thomas F. Bergin, Charlottesville, Va. (Court-assigned counsel), for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on brief), for appellee.

Ronald P. Sokol, Charlottesville, Va., amicus curiae.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

SOBELOFF, Circuit Judge:

Sentences of life imprisonment for rape and forty years for a five dollar robbery, to be served "consecutively," were imposed on Raymond Palmer in 1958. He had first been tried in 1957, but a mistrial was declared. His second trial, in 1958, ended with a hung jury. At his third trial later in the same year he waived jury trial and was found guilty.[1] He did not appeal. In 1962 Palmer's petition to the Supreme Court of Appeals of Virginia for a writ of habeas corpus was summarily dismissed. The United States Supreme Court denied certiorari in February, 1963. Palmer v. Cunningham, 372 U.S. 921, 83 S.Ct. 740 (1963). In April, 1963, a petition for federal habeas corpus relief was filed in the District Court, and dismissed after a hearing. From an order dismissing the petition Palmer appealed, and we appointed counsel.

1. The same judge presided at all three trials.

In this court Palmer's sole complaint is that his Fourteenth Amendment rights were infringed because of the manner in which the police secured an identification of his voice by the prosecuting witness. In order to pass upon this question, it will be necessary to review in some detail the facts preceding the trial, as disclosed in the record and not disputed by counsel.

On Wednesday afternoon, March 27, 1957, Mrs. Martha Britt, a white woman, was in her home in Southside, Virginia, with her three and one-half year old daughter, JoAnn. Around two o'clock when she opened the back door to throw some bread to her dog, she saw a man standing just inside the door. Over his head was a heavy paper clothespin bag which she later testified "fit snugly." [2] She turned away quickly, but the man grabbed her around the neck, preventing her from getting a close look at him. During the 15 to 30 minutes that the intruder was in her home, she said he took five dollars from her and "had an intercourse." It appears that her three and one-half year old daughter was screaming during much of the time he was there.

Following the attack, Deputy Sheriff Raymond Early of Nansemond County was notified and an intensive investigation was begun. On arrival at Mrs. Britt's home, the Sheriff found her "very nervous, upset and crying. She was just emotionally upset; all to pieces." She was able to recall very little about her attacker; only that he was a Negro "about the same height" as she; that he wore an "orange-colored" sport shirt; [3] that he had "been drinking;" and that while in her house, he spoke with a "high, childlike voice * * * like a quiz kid or an M.C. asking questions."

On Wednesday evening, a few hours after the attack, Mrs. Britt was brought to police headquarters to view a lineup of four or five Negroes, to test her ability to recognize voices. Petitioner was not in this group. The suspects walked back and forth before Mrs. Britt and each spoke, but no identification was made.

The following afternooon the police picked up Robert Flythe, an 18-year old Negro boy, for questioning. Sheriff Early and several other officers asked him if he knew of a woman having been raped. Flythe at first denied any knowledge of the crime, but after about an hour's questioning, he accused Palmer, his next-door neighbor. According to Flythe's story, Palmer had admitted raping a white woman the day before, and had given him (Flythe) most of the details. Relying on this statement, the police then arrested Palmer. This was on Thursday, the day after the crime. Palmer was then wearing an orange-colored shirt; but it was never definitely identified at the trial as that worn by the attacker. At all three trials Palmer, his wife, and a neighbor testified that petitioner was wearing blue slacks and a white sweater on Wednesday, the day of the attack. [4]

After taking Palmer to the police station, Sheriff Early returned to Mrs. Britt's home and brought her, and her next door neighbor, to the station. On the way the Sheriff told Mrs. Britt that the police had a suspect, that he was a Negro, and that they wanted her to listen to his voice to see whether she could identify it. The events which followed in the station house resulted in the principal evidence relied on by the State to connect Palmer to the offense. In stark contrast to the previous evening there was no lineup. Mrs. Britt was not allowed to see the suspect whom she was attempting to identify. For some unexplained reason Flythe was not subjected to a voice identification, despite the fact that he had been a suspect several hours before and his self-exculpatory statements were the only basis for Palmer's arrest. Nor

2. This was a "purina chow bag" which had been fitted with a metal ring at its base.

3. At the second trial, which resulted in a hung jury, Mrs. Britt had described the shirt as "yellow or gold-colored."

4. Flythe was the only witness who stated that Palmer was wearing an orange shirt, and it was brought out at the trial that he himself owned a shirt of similar color.

did the police provide any other voices for comparison with Palmer's.

Mrs. Britt and her neighbor were placed in one room, while Palmer, Sheriff Early, and another officer were in an adjoining room separated by a door which was left "a little ajar." The orange-colored shirt, which Palmer was wearing when arrested the day after the attack, had been removed from his back before Mrs. Britt arrived at the station, and was shown to her while she was seated in the adjoining room. This was the shirt Mrs. Britt described at the trials as "about the same color" as that worn by her attacker. Sheriff Early's testimony was unclear as to whether the shirt was shown to her before listening to the voice, or immediately thereafter.

Mrs. Britt had previously told the police of certain phrases that her assailant uttered, and these were used as the vehicle for identification. The Sheriff directed Palmer to repeat after him the words which Mrs. Britt had attributed to the intruder, and Palmer obeyed. The clothespin bag which had been described as "fitting snugly" over the attacker's head was in the Sheriff's possession but was not used during the interrogation. After listening to this exchange for several minutes, Mrs. Britt, in answer to a question by Sheriff Early, stated that one of the voices she had heard in the adjoining room was that of her assailant. Palmer was given no opportunity to confront or to be confronted by his accuser, where she might have made a comparison of his color with that of her assailant or might have noticed some mark or mannerism that could aid her in affirming—or disavowing—the voice identification.

At all three trials the State merely had Mrs. Britt testify to having made this station house identification, but she did not attempt an identification in open court. Other than Flythe's statement, the above testimony of Mrs. Britt was the sole evidence possibly linking Palmer to the crime.

The opportunity for suggestion inherent in the procedure used to secure this identification is manifest. Before listening to the voice that spoke in response to the Sheriff in the station, Mrs. Britt had been told that the police had a Negro suspect in custody. She had been shown the suspect's shirt—the shirt which she later testified was "about the same color" as that worn by her assailant. On Wednesday evening, in accordance with customary practice, Mrs. Britt had been asked to select one of a number of persons in a lineup. It is noteworthy that on Thursday evening an entirely different course was followed. Palmer's was the only voice the complainant was permitted to hear repeat the damning words. When she was asked if she could identify the voice, the only voice that was submitted for identification, the highly suggestive atmosphere that had been generated could not have failed to affect her judgment.

Any identification process, of course, involves danger that the percipient may be influenced by prior formed attitudes; indeed we are all too familiar with instances in which supposedly "irrefutable" identifications were later shown to have been incorrect.[5] Where the witness bases the identification on only part of the suspect's total personality, such as height alone, or eyes alone, or voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so when the identifier is presented with no alternative choices; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect.

To alleviate the effect of such influences upon a complaining witness, a lineup is generally regarded by police authorities as essential.[6] Where the identification is by voice alone, the absence of some comparison involves grave danger of prejudice to the suspect, for as one noted commentator has pointed out:

> "[E]ven in ordinary circumstances we must be cautious and accept only with

5. See Borchard, Convicting the Innocent. p. xii (1932); Frank, Not Guilty, p. 31 (1957).

6. Criminal Investigation and Interrogation, Gerber & Schroder ed. § 22.20 (1962).

reserve what a witness pretends to have heard. All the more must it be so if there are special difficulties in the way —if, for example, the voice comes from a great distance, if it is shrill, muffled, or presents any other peculiarity. The same is true if the person whose voice has been heard is of a different nationality from the listener, if he speaks another dialect, or is better or less educated. Criminal Investigation, Jackson ed. (5th ed. 1962), at 41–42.

Mrs. Britt's assailant was of a different race, and spoke through a heavy paper clothespin bag which doubtless muffled his voice; yet this same paper bag, in the possession of the police, was not worn by Palmer on the night of the identification.

Sheriff Early himself stated that the use of lineups was standard practice in Nansemond County. In fact, the evening before the arrest he had himself arranged a voice identification lineup for Mrs. Britt, making four or five voices available for comparison. When asked why this procedure was abandoned the following night for Palmer's identification, the Sheriff at first answered that he really had no reason, then testified merely that "I didn't want her to see him." But he still offered no explanation for the failure to afford Mrs. Britt at least a choice among several voices, rather than concentrating solely on Palmer's.

■■ Unquestionably, the most telling piece of evidence in the record was the narration of the events in the station house. Yet at this most critical point in the proceedings against him—the voice identification—Raymond Palmer was deprived of the most elementary safeguards of the law. In their understandable zeal to secure an identification, the police simply destroyed the possibility of an objective, impartial judgment by the prosecutrix as to whether Palmer's voice was in fact that of the man who had attacked her. Such a procedure fails to meet "those canons of decency and fairness" [7] established as part of the fundamental law of the land. A state may not rely in a criminal prosecution upon evidence secured by pumping a man's stomach,[8] by breaking into his home,[9] or by employing subtle psychological methods on him;[10] nor may it rely on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction.[11]

■ The State objected at the oral argument in this court, though not in its written briefs, that the due process point had not been clearly raised in the state court habeas corpus proceeding. We find, however, that at the state trials the identification procedures were inquired into in exhaustive detail. The infirmity discussed above goes to the heart of the case and clearly appears in the transcript of those proceedings. The record was available in the District Court and is now before us, and the facts relating to the identification process are not in dispute. It has been eight years since Raymond Palmer was convicted at his third trial, and we think that comity between the state and federal courts will not be served by further delaying disposition of the matter on its merits. The case will be remanded to the District Court with instructions to grant the writ and order the appellant's release, unless

7.  Malinski v. People of State of New York, 324 U.S. 401, 416–417, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

8.  Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R. 2d 1396 (1952).

9.  Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961).

10. Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).

11. At the reargument of this case, we requested discussion of the possible effect of the fact that Palmer was without counsel at the identification, in light of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Cf. United States ex rel. Stovall v. Denno, 2 Cir., 355 F.2d 731, (Jan. 31, 1966). We do not reach Escobedo problems, however, since we conclude that the entire atmosphere surrounding the identification was a violation of due process.

the Commonwealth will with reasonable promptness afford him a new trial, uninfected by the voice identification testimony.

It is so ordered.