Commonwealth *v.* Marino et al., Appellants.

Argued June 14, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*John H. Lewis, Jr.,* for appellant.

*B. Nathaniel Richter,* for appellants.

*Alan J. Davis,* Assistant District Attorney, with him *James D. Crawford,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MONTGOMERY, J., September 13, 1968:

These several appeals are from judgments of sentence following the convictions of the appellants, Francis Marino, Salvatore Rispo, Jr., and Arthur Ashkenase, on charges of blackmail, extortion and conspiracy, in a trial before Honorable EDMUND B. SPAETH, JR., Judge, sitting without a jury.

The facts on which the convictions were based follow. Between July, 1965 and November, 1966, defendant Ashkenase loaned to Morris B. Singer, who operated a haberdashery store in Bucks County, Pennsylvania, various sums of money totaling $4,150. By November, 1966 Singer had repaid $1,650 leaving a balance of $2,500 plus interest. Nevertheless, in November, 1966 Ashkenase demanded $8,800 claiming that was the amount still owing to him.

What transpired thereafter is stated in the opinion of the lower court, i.e.:

"On Tuesday, November 8, 1966, defendants Ashkenase and Rispo went to Singer's place of business in Fairless Hills, Bucks County, Pennsylvania. Singer testified that he was informed by Rispo that 'Ashkenase was paid off', and that he now owed Rispo 'and his people the sum of $10,000.' Rispo threatened to kill Singer and Singer's wife if the 'debt' were not paid immediately.

"Rispo told Singer to dial a Philadelphia telephone number, saying that 'a girl will probably answer "The Teamsters" ', and telling him to 'ask for the "Big Man" '. Singer dialed the number but was too frightened to talk, and so gave the telephone to Rispo. After Rispo had said a few words he returned the telephone to Singer. The man from the Teamsters told Singer that Ashkenase had been paid and that Singer had better come up with $10,000.00, and he asked how much money Singer had on him. After the telephone conversation, Rispo took from Singer $250.00 in cash, a diamond ring, and a watch. He again threatened Singer and told him that they would call him that evening to set up a meeting. When Singer said that he had recently had his telephone number changed, Rispo replied 'Don't worry. We know everything. We'll know your number.' Before leaving, Rispo again warned Singer: 'Don't f—— with us because we're big

people and there is nobody bigger than us. You heard about what happened over at 107.'

"That evening the 'Big Man' telephoned Singer at his home, informing him that he had better have $4,500.00 by Friday morning. (As will appear, the 'Big Man' was defendant Marino.) After this call, Singer went to the Philadelphia District Attorney's Office, where he told Sgt. McLellan the whole story.

"Nothing happened on Wednesday, November 9. On Thursday, November 10, Singer received another telephone call at his home from the 'boss'. Detective Kelly and Mrs. Singer were present. Singer repeated the conversation to the detective. Approximately 15 minutes later, Rispo telephoned and again threatened Singer. Finally, about 15 minutes after Rispo's call, the 'Big Man' telephoned again. He told Singer that they were going to have a meeting the next morning and that Singer would receive directions by telephone at exactly 8:00 a.m.

"At 8:00 a.m. on Friday, November 11, Singer was telephoned and was told by the 'Big Man' to go to Lerner's Restaurant where, he was told, he would see someone he knew.

"Sgt. McLellan and three detectives were present in Singer's apartment when this call was received, and they accompanied Singer to the restaurant. They instructed Singer to signal them by pulling his handkerchief from his pocket if at any time he felt that he was in danger.

"Detective McLaughlin and Detective Lynch entered the restaurant before Singer. Detective Lynch saw defendant Rispo seated alone in the rear of the room. Moments later he saw defendant Marino go over to Rispo's table, engage in a few words of conversation, and then go to the counter and order breakfast. Detective Lynch knew Marino was from Teamsters Local 107.

"When Singer arrived at the restaurant, he proceeded to the table where Rispo ('the man he would know') was and sat down across from him. At approximately the same moment, Marino walked to within three feet of Rispo's table, as if to join them, but stopped, turned quickly, and sat down at the adjacent table, directly next to Singer. The officers observed Rispo motion to Singer, and heard him tell Singer to 'move the f—— over here [next to Rispo] or I'll . . .' Sweating profusely, Singer pulled his handkerchief from his pocket and the officers moved in.

"Sgt. McLellan placed Rispo under arrest. At this time Detective Lynch informed Sgt. McLellan that Bobby Marino from the Teamsters was with Rispo. Sgt. McLellan testified that he had noticed Marino because of his size—a 'great big man'—and that it was common knowledge in the Police Department Labor Union and Labor Squad that Marino was known as 'Big Bobby'.

"Aware of the foregoing facts, and '. . . knowing that there had been more than one man involved in this thing', Sgt. McLellan placed Marino under arrest.

"Marino was taken to Room 708A in City Hall, where preliminary arrest reports were made out. Detective Lynch warned Marino of his right to remain silent and asked him no questions beyond those necessary to make out the *routine arrest reports*. No attempt was made to interrogate him.

"Within Room 708A, a partition about five feet high separates Sgt. McLellan's office from a conference room. Singer was in the office with Sgt. McLellan. On the other side of the partition, Marino and Rispo and Detective Lynch *and other police officers* were engaged in general conversation about policemen working extra hours, truckers' strikes, etc. (No reference was made to the complaint in this case.) They spoke thus for approximately 15 to 20 minutes. Singer

did not know who was on the other side of the partition in Room 708A. Upon hearing the general conversation on the other side, Singer jumped up excitedly and informed Sgt. McLellan 'That's the voice on the phone. Whoever is over there is the voice on the phone.' Sgt. McLellan asked Marino to come out and talk again and Singer made a positive identification."

## Jurisdiction

All appellants question the jurisdiction of the Quarter Sessions Court of Philadelphia County to render judgment on the indictments charging blackmail and extortion based on the threat to Singer by telephone received by him in Bucks County. Jurisdiction is not questioned by any of the appellants on the conspiracy charges.

The record is sufficient to sustain the finding of the lower court that the speaker who made the threats by telephone was at a telephone in Philadelphia. Cited in support of appellants' argument that the Courts of Bucks County had exclusive jurisdiction are the cases of *Commonwealth v. Murray*, 423 Pa. 37, 223 A. 2d 102 (1966), and *Commonwealth v. Taub*, 187 Pa. Superior Ct. 440, 144 A. 2d 628 (1958). Appellants mistakenly interpret these decisions as holding that venue is *exclusively* established in the county where the victim of a threat by telephone hears the threat and is put in fear, whereas the correct holding in such cases is that the crime of bribery is not complete until the victim hears the threat, although it has been initiated elsewhere, and for that reason prosecution for the crime may be conducted where the threat is received. However, these cases do not hold that prosecution for the crime may not also be conducted where the threat was made. See *Commonwealth v. Keenan*, 199 Pa. Superior Ct. 1, 184 A. 2d 793 (1962), wherein this Court

recognized that jurisdiction to try persons charged with the crime of blackmail lies in either the county where the blackmail threat is initiated or received, which case refers to *Commonwealth ex rel. Sickler v. Yaukey*, 11 Pa. D. & C. 2d 11 (1956). The insidious act for which the law provides punishment is the threat which in the present case was made in Philadelphia; and although it did not become a completed crime until it was heard by the victim, there is more reason to give jurisdiction to the courts of the county where it was initiated and where the one who makes the threat may be more readily apprehended. In such cases it appears to be generally held that the victim's presence in one county when threats to kill are made on the telephone do not conflict with the accused's presence in another county where the venue of the prosecution is laid. 22 C.J.S. Criminal Law §185(13), Extortion and Threats.

## Multiple Conspiracy Indictments

Appellants also jointly charge duplicity in the indictments charging them with conspiracy. We agree there is but one conspiracy, that of Ashkenase, Marino and Rispo, to extort money from Singer in an amount in excess of what he legally owed to Ashkenase on the loans aforementioned.

The three indictments (Nos. 361, 363, 364) charging conspiracy entered into by the three appellants in Philadelphia County to levy blackmail and extort money from one Morris Singer are identical except in the particular of date. One alleges they conspired on November 8, 1966, the second on November 9, 1966 and the third on November 11, 1966. Two of these dates correspond with the dates of the overt acts of the conspirators as previously described. November 9, 1966 is the exception as nothing occurred on that day. This

record clearly indicates but one conspiracy. Therefore, there is duplicity in the indictments charging separate offenses on the several dates aforementioned. However, duplicity, if not objected to in a timely and proper manner, is cured by verdict but permits but one judgment of sentence. 18 P.L.E., Indictment & Information, §90; *Commonwealth v. Eberhardt*, 164 Pa. Superior Ct. 591, 67 A. 2d 613 (1949). As to appellant Ashkenase, there was but one judgment of sentence of 60 days to one year in the Philadelphia County Prison on Bill 361. On Bills 363 and 364 he was given concurrent probations of two years each, to begin at the expiration of the sentence on Bill 361. These orders providing for probation will be arrested since they were imposed on bills that are duplications of the bill on which he was sentenced. As to the other appellants, Marino and Rispo, their sentences were one to two years on Bills 361, 363 and 364, but are made to run concurrent with a sentence imposed on Bill 365 which charged blackmail and extortion. The sentences on Bills 363 and 364 will also be arrested for duplicity.

## Sufficiency of Evidence as to Ashkenase

Ashkenase, alone, questions the sufficiency of the evidence to sustain the charges on which he was convicted. Without repeating the facts previously set forth, we find them to be sufficient to sustain all charges. This appellant made numerous demands on Singer, he went with Rispo to the business place of Singer where he aided and abetted Rispo in threatening Singer and forcibly taking from him articles of value, after Singer was again threatened by the "Big Man" of the "Teamsters"; he later engaged in a telephone conversation with Singer concerning a subsequent meeting with Rispo. He was too much involved

in the operation intended to extort money from Singer to permit him to escape conviction by saying that he had no interest in the matter since he had previously assigned his claim to Rispo and his people. There was sufficient evidence against him to justify the court's conclusion that he was part of the conspiracy to extort money from Singer and therefore he was responsible for the acts of anyone of his fellow conspirators. *Commonwealth v. Parmer*, 364 Pa. 11, 70 A. 2d 296 (1950).

The two cases cited by this appellant in support of his position are readily distinguishable from the present one. In *Commonwealth v. Yobbagy*, 410 Pa. 172, 188 A. 2d 750 (1963), the only evidence to support the charge against Yobbagy was a statement referring the victim of the extortion to his superior. This was held to be insufficient to meet the burden of proof placed on the Commonwealth. It did not prove an agreement to accomplish either an unlawful purpose or a lawful purpose by unlawful means—the gist of the crime of conspiracy. Likewise in *Commonwealth v. Neff*, 407 Pa. 1, 179 A. 2d 630 (1962), the Supreme Court found that the Commonwealth's burden had not been met because the agreement found to have been made could consistently be interpreted as for a lawful purpose as for an unlawful one, overruling this Court which had determined that the agreement clearly showed that it was for an unlawful purpose, 195 Pa. Superior Ct. 420, 171 A. 2d 561 (1961).

The principles of law relating to conspiracy were recently summarized by President Judge ERVIN in *Commonwealth v. Schwartz*, 210 Pa. Superior Ct. 360, 233 A. 2d 904 (1967). From that statement we emphasize that the heart of the offense is the common understanding, no matter how it came into being, as long as the evidence is such as reasonably and naturally justifies an inference of guilt and is of such volume

and quality as to overcome the presumption of innocence and satisfy the jury beyond a reasonable doubt. Although a conviction will not be allowed to stand if based solely upon suspicions and conjectures, the acts and conduct of the defendants done in pursuance of the original scheme may be considered as proof of the unlawful intent, and the conspiracy may be established by proof of the relation, conduct and circumstances of the partners.

We conclude that the evidence was of such quality and quantity as to prove beyond a reasonable doubt that Ashkenase conspired with Rispo and Marino to extort from Singer more money than Singer was obligated to pay, and to take unlawful means of collecting same, it being immaterial whether the money was owing to Ashkenase or to either of the others. The evidence is so abundant establishing the efforts of Marino and Rispo to extort money from Singer, for which Ashkenase would be equally responsible as a coconspirator, that we shall refrain from discussing it.

### Trial Errors Asserted by Ashkenase

Ashkenase first complains that he was not permitted to interrogate Singer on cross-examination about his past business activities, particularly his attempts to avoid payment of valid obligations to other people, in order to show his motive in making this accusation against him. Our examination of this voluminous record discloses wide latitude in the cross-examination of Singer over a three-day period. We find no merit in this assignment of error. Aside from the fact that Singer was asked many things about his previous business activities, the limits of cross-examination is largely a matter of discretion with the trial judge who here heard the case without a jury, *Commonwealth v. Olit-*

*sky*, 184 Pa. Superior Ct. 144, 133 A. 2d 238 (1957);
*Commonwealth v. Cano*, 182 Pa. Superior Ct. 524, 128
A. 2d 358 (1956), affirmed, 389 Pa. 639, 133 A. 2d 800
(1957). Furthermore, this objection was not raised
below in the post-trial motions and cannot be raised
now in this appeal. *Commonwealth v. Whiting*, 205
Pa. Superior Ct. 92, 208 A. 2d 1 (1965).

Next, complaint is made that the trial judge should
have stricken Singer's testimony because he had vio-
lated an order of sequestration. Here again the post-
trial motions did not include this reason. Neverthe-
less, we have examined the record closely and reached
the conclusion that this complaint is frivolous and in-
volved no abuse of discretion on the part of the trial
judge.

Objection is also made as to the admission of an
out-of-court declaration by Singer after his initial com-
plaint to the police, and in precluding the use of expert
testimony to show the effect of narcotic addiction upon
such witnesses. As to the second of these the record
shows wide latitude was given to the appellants to
establish that Singer was a drug addict, and to show
the effect of drug addiction on the competency of a
witness to testify truthfully. The only limitation on
the testimony of Dr. Rieders, a toxicologist who had
never examined Singer, was in refusing him permis-
sion to answer the question "would it have any other
demonstrable physical effects on the person" after he
had testified he could give an opinion with respect to
only 75 to 80 per cent of individuals studied. We find
no abuse of discretion by the trial judge or any preju-
dice to appellants in view of the fact Singer testified
for three days during which his actions were plainly
disclosed to the trial judge. Furthermore, the effect
of the use of narcotics was fully explained not only
by Dr. Rieders but by a Dr. Moore, a psychiatrist.

The first of the last two complaints concerns the admission into evidence of Exhibits C-1 to C-6. These consisted of written notes of each of three telephone conversations Singer had received from Rispo and Marino. C-4 to C-6 were notes made by Detective Kelly as the substance of the three telephone messages received by Singer. Detective Kelly had been assigned to the case following Singer's initial complaint to the police and was present at Singer's home when the messages were received there. The calls were received at about 9:50, 10:15, and 10:30 p.m. on November tenth. Within a few minutes after the third call was received, Singer, while in a highly nervous state, perspiring and shaking, told Detective Kelly what had been said and the notes were made by him. C-1, C-2, and C-3 were made by Singer on the second day after he received the calls. On the first day following their receipt he had made copies of the notes made by Detective Kelly for his own use but these were destroyed after he had made a new set of notes marked C-1, C-2, and C-3 by recopying the set made initially. The only material variation was that the true names of his callers were inserted after they became known. Except for the insertion of the names in C-1, 2, and 3, they do not vary materially from C-4, 5, and 6.

Exhibits C-1, 2 and 3 were not brought to court by Singer until he was requested to do so by counsel for Marino for purposes of cross-examination. The request was made on the authority of *Jencks v. United States*, 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103 (1957). In addition to the request for production of these notes, it was also requested that someone designated by the court go with Singer to procure them in order to prevent their being altered by Singer. Detective Roman was so designated by the court; and he was further instructed to deliver them to Mr. Davis, the Assistant District Attorney trying the case, for the

purpose of making Xerox copies. This request or demand was apparently acquiesced in by counsel for the other defendants.

At the next session of the trial court it was reported that defense counsel had been provided not only with copies of Exhibits C-1 to C-6, but with a copy of another statement Singer had given the police on November eleventh after he had identified Marino by his voice. Thereafter Singer was cross-examined for over two days about the various statements he had made to establish that he had made conflicting statements concerning the events that had transpired, and particularly on the point that he had not referred to the three phone calls covered by Exhibits C-1 to C-6 in his statement to the police made on November eleventh. A large part of this interrogation was for the purpose of attacking his credibility as a witness, as was his cross-examination on the use of drugs.

Where the testimony of a witness has been impeached by proof of conflicting statements or by a suggestion that his testimony is a recent fabrication, the party offering the witness may be permitted to prove prior statements consonant with his testimony, not as evidence of the facts stated by the witness, but to sustain the credibility of the witness by showing that his testimony is not a fabrication of recent date. *Commonwealth v. Martin*, 124 Pa. Superior Ct. 293, 188 A. 407 (1936). Furthermore, if some portions of a statement made by a witness are used on cross-examination to impeach him, other portions of the statement which are relevant to the subject matter on which he was cross-examined may be introduced in evidence to meet the force of the impeachment. *Cafasso v. Pennsylvania R. R. Co.*, 169 F. 2d 451 (1948). The admissibility of a consonant statement is discretionary, and depends largely upon the character and degree of impeachment. *Commonwealth v. White*, 340 Pa. 139, 16

A. 2d 407 (1940); *Commonwealth v. Trignani*, 185 Pa. Superior Ct. 332, 138 A. 2d 215 (1958), affirmed 393 Pa. 140, 142 A. 2d 160 (1958).

Our examination of the record discloses that the only objection to the offer of C-1, 2 and 3 by the Commonwealth was made by Mr. Chalfin, counsel for Rispo, as follows:

"MR. CHALFIN: The evidence is Mr. Singer's testimony which we have had, not whatever writings he made on pieces of paper.

"THE COURT: Oh, but he was examined and cross-examined about them.

". . .

"MR. CHALFIN: The fact that he was examined and cross-examined, Your Honor, I respectfully submit, does not make them admissible. Because he's tested for credibility, that doesn't make it an exhibit in the case, Your Honor."

The objection to C-4, 5, and 6 was made by all three defendants as follows:

"If the Commonwealth had chosen Det. Kelly as its witness and wanted him to testify as to conversations, he was certainly free to do so. If he had to refresh his recollection from notes, we might have to contest his ability to memorize what took place.

"But the only evidence from Det. Kelly is that he took notes after three phone calls were made and he relied on Mr. Singer's memory of those three phone calls. I don't think it's good evidence. The contents, I would certainly argue, are not good. But, certainly, the pieces of paper are not admissible under any theory of evidence law."

The objections were overruled and the exhibits received without comment.

The statements recorded on Exhibits C-4, 5, and 6 are similar to that in *Commonwealth v. Friedman*, 193 Pa. Superior Ct. 640, 165 A. 2d 678 (1960), where-

in we approved the admission of a statement made by the person sought to be bribed as part of the res gestae. The only difference in the two cases is in the particular that the statement was recorded in writing in the present case. *Commonwealth v. Flex,* 209 Pa. Superior Ct. 482, 229 A. 2d 485 (1967), cited by appellant Ashkenase, is distinguishable for the reason that the element of spontaneity was lacking therein. However, it would appear that appellants' objection was not made for the reason that C-4, 5, and 6 were not part of the res gestae or prior consonant statement; but for the reason that a proper foundation was not laid for their admission. Appellants contend that Detective Kelly should have testified as to the contents of the notes made by him, using them to refresh his memory, but since he did not do so the notes themselves were not admissible evidence although identified by him. Nor did this witness state that he could not testify from memory, even after using the notes to refresh it. He was not asked to testify as to their substance. In *Commonwealth v. Butts,* 204 Pa. Superior Ct. 302, 309, 204 A. 2d 481 (1964), we had occasion to consider this principle, speaking through our present President Judge WRIGHT, as follows: "Where a witness has no present recollection of a past event, even when aided by a memorandum made at the time, the memorandum itself may be offered in evidence, on testimony by the witness of his knowledge of its accuracy when made, and that it was made when the transaction was fresh in his mind: . . ." Otherwise, of course, it is inadmissible generally. It would have been error, therefore, on the part of the learned trial judge to admit these exhibits to establish their content. However, in view of other matters occurring at the trial and hereinafter mentioned, the exhibits were admitted only for a limited purpose, and resulted in no prejudicial error requiring a new trial.

Since the success of these prosecutions depended almost entirely on the testimony of Singer, the defendants extended every effort and used every means legally available to discredit him. They demanded of the District Attorney every statement Singer had made and they used every one to show he had made conflicting statements. These included not only Exhibits C-1 to C-6, but also the statement he made to the police on November eleventh, and transcripts of his testimony given at four preliminary magistrate hearings. Since parts of these statements were disclosed in the questions put to the witnesses and the trial judge was permitted to read them with the consent of appellants' counsel, the other portions relevant to the subject matter were admissible in their entirety under *Cafasso v. Pennsylvania R. R.*, supra. Therefore, in view of the testimony that C-1 to C-3 were copies of C-4, 5, and 6, and that the court had knowledge of the contents of C-1, 2, and 3, appellants were not prejudiced by the offer of C-4, 5, and 6 rather than have Detective Kelly use them merely to refresh his memory.

Although counsel for Ashkenase properly objected to the use of C-1, 2, and 3 as substantive evidence since they were used solely to attack the credibility of Singer, the record does not show that they were used for the objectionable purpose. Singer, in his testimony in chief had testified as to the phone calls, and Judge SPAETH, in his opinion, states specifically that "Singer's statements as recorded by Detective Kelly were admissible as prior consonant statements." The trial record also supports this statement. Exhibits C-1 to C-6 inclusive were all accepted only for the purpose of corroborating Singer's testimony given at trial.

As previously recited the statements made by Singer to Detective Kelly at the time the telephone calls were received on November tenth, were part of the res gestae. However, Judge SPAETH accepted them as

only affecting the credibility of Singer. Appellants, therefore, were not prejudiced by this limitation on their use by the trial judge. Viewing them on that basis we find them sufficient to meet the requirements of prior consonant statements. When made to the detective they certainly were made at a time before Singer was aware that any prosecutions would be instituted for the extortion threats made during these phone conversations; and furthermore, since they could have been considered as part of the res gestae they were made under circumstances making it unlikely that they would be fabricated.

We conclude there was no reversible error committed by the introduction of Exhibits C-1 to C-6.

Ashkenase contends that the trial judge passed on the credibility of this appellant before the conclusion of the case. We find nothing in the record supporting this contention and furthermore, since this question was not raised below we shall not resolve it here.

A final argument advanced by Marino as to Exhibits C-4, 5, and 6 is that if they were properly admitted they destroyed the prior testimony of Singer given at the trial because they do not show a threat of bodily harm to Singer. Aside from the threat of bodily harm which might be implied from the conversations and which placed Singer in great fear, since the exhibits were received merely as affecting credibility and not for probative purposes, this argument has no merit.

### Marino's Identification by Voice

The remaining argument presented to us relates to the identification of Marino and concerns the alleged violation of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

It is first contended that Marino's arrest was illegal and for that reason what followed was tainted under the Fourth Amendment. However, under the facts as previously stated we conclude that there was reasonable and probable cause for Marino's arrest without a warrant. The arresting officer had been informed that a conspiracy existed among Ashkenase, Rispo, and a "Big Man" of the Teamsters of Philadelphia, and they knew that Marino fitted the description of that third member of the conspiracy; they saw that third man in the company of Rispo whom he engaged in conversation by word and gesture; they heard Rispo again threaten Singer when Marino was close by; and they observed the fear that shown on Singer's face as a result of that conversation. Knowing these things the officers had probable cause for the arrest of Marino along with Rispo, two of the conspirators who had committed the felony of robbery of Singer by taking his ring and watch, and the felony of extortion under Section 806 of The Penal Code, 18 P.S. §4806, by threatening to destroy his merchandise with paint and breaking the windows in his store, and the misdemeanor of blackmail and extortion under Section 801 of The Penal Code, 18 P.S. §4801, committed in their presence at Lerner's Restaurant. It is clear to us that the information possessed by the arresting officers was sufficient to satisfy the requirements of *Carroll v. United States,* 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), relied on by the appellant Marino, and the Pennsylvania cases of *Commonwealth v. Negri,* 414 Pa. 21, 198 A. 2d 595 (1964), reargued 419 Pa. 117, 213 A. 2d 670 (1965), and *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A. 2d 304 (1963), cert. denied, 375 U.S. 910, 84 S. Ct. 204, 11 L. Ed. 2d 149. Therefore, what followed in connection with the identification of Marino by voice was not tainted by any illegality in the manner he was arrested.

We next proceed to the circumstances surrounding Marino at Room 708A Philadelphia City Hall when his voice was identified by Singer as the same that he had heard over the telephone on November eighth at his store in Bucks County, and at his home in Philadelphia on the evening of November tenth and the morning of November eleventh. Room 708A is a large room with a partition five feet high to reserve part of it as an office for the sergeant in charge. The remainder is used as a conference room. In the conference room Marino and Rispo were engaged in general conversation with the detectives who had them and others in charge, all unaware of the presence of Singer and Sergeant McLellan in the office of the sergeant. Singer was also unaware of the presence of Marino in the conference area. Suddenly, and without suggestion from anyone, Singer identified one of the voices on the other side of the partition as the voice on the phone. Thereupon Marino and Singer were confronted with one another, Marino was asked to speak, and was again identified by voice by Singer.

Marino had not requested counsel or been advised of his right to counsel, and had been advised of his right to remain silent. He was asked no questions concerning the cause of his arrest. No questions were asked of him beyond those necessary to make out a routine arrest report. The other conversation in which he engaged was general in nature.

Lastly, we find no violation of due process or other constitutional rights under any of the Amendments to the United States Constitution previously mentioned. The circumstances under which Marino spoke in Room 708A of the Philadelphia City Hall fall far short of those disapproved in *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293,

87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); and *Palmer v. Peyton,* 359 F. 2d 199 (4th Cir. 1966). As in *Stovall,* the situation existing at the time Singer heard Marino's voice was not a line-up or confrontation, nor was Marino's voice singled out for the purpose of identification. On the contrary, for over fifteen minutes he had been discussing generalities with numerous other persons, including the two arresting officers, while Singer was in another area of the room with the sergeant in charge of the office. Marino had been advised that he might remain silent but voluntarily engaged in the general conversation. There is no evidence of coercion, legal or factual, to make him speak. On the other hand Singer had not been informed of Marino's presence on the other side of the partition and he had no knowledge that he would hear Marino's voice. When it was heard by him speaking words not related to anything that concerned Singer, it was unexpected and came as a surprise. The situation negatives anything unnecessarily suggestive, or conducive to irreparable mistaken identification, as to deny due process. On the contrary, it bears striking similarity to the situation referred to in *Hoffa v. United States,* 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966), in adopting the statement from the dissenting opinion in *Lopez v. United States,* 373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963): "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." Marino was aware that he was in a large room with other people possibly on the other side of the partition. Nevertheless, he chose to talk and thereby assumed the risk of being overheard.

We have carefully reviewed the voluminous record and conclude that Judge SPAETH fairly tried these

cases without prejudicial trial error; that he gave appellants every opportunity to discredit the Commonwealth's principal witness; and that his decision is based on sufficient competent evidence.

Therefore, with the exception of the orders of probation on Indictments 363 and 364, which are hereby vacated for duplicity as to all appellants, the appeals are dismissed and the judgments of sentence affirmed.

It is further ordered that the appellant-defendants Francis Marino, Arthur Ashkenase, and Salvatore Rispo, Jr., are directed to appear in the court below at such time as they may be there called, and that they be by that court committed until they have complied with the sentences or any part of which had not been performed at the time the appeals were made a supersedeas.

―――――

DISSENTING OPINION BY WATKINS, J.:

The voice identifications of Marino in Room 708A in Philadelphia's City Hall violated his right of due process. After Marino's lawful arrest he was taken to Room 708A in Philadelphia's City Hall and engaged in conversation with a co-defendant, an arresting officer and other policemen. He was advised of his right to counsel and of his right to remain silent. The conversation, however, revolved around seemingly general topics including policemen working extra hours and *truckers strikes* and Marino willingly participated. All present were unaware that the complaining witness and Sgt. McLellan, another arresting officer, sat on the other side of a five foot tall partition in the same room. But Sgt. McLellan knew that Marino was on the other side of the partition before any identification was made. [N.T. 685]

After fifteen to twenty minutes of conversation the complaining witness jumped up and stated "That's the

voice on the phone [which had threatened him]. Whoever is over there is the voice on the phone." Thereupon, Sgt. McLellan asked Marino to come out and talk again in the presence of the complaining witness. The latter then made a second identification which he stated was based solely on hearing Marino's voice.

In *Peyton v. Palmer*, 359 F. 2d 199 (4th Cir. 1966), cited with approval in *Stovall v. Denno*, 388 U.S. 293 (1967), the court stated that petitioner was denied due process of law when without being advised of his right to counsel or of his right to remain silent and following police directions he spoke into a paper bag the words used by the robber of the complaining witness. Thereupon, he was identified as the robber by the complaining witness who was stationed in an adjacent room.

The court held that the identification was a violation of due process in that only one voice was submitted for identification in an atmosphere that itself suggested that the defendant was guilty of the crime.

Likewise, in the instant case, the first voice identification may have been induced not only by Marino's tone of voice but also by other circumstances arising out of his confinement. Marino talked about truckers' strikes when the complaining witness knew that the person who threatened him was affiliated with the Teamster's union. In addition, Marino addressed an arresting officer and a co-defendant both of whom were already known to the complaining witness. These factors may have contributed to the complaining witness' association of Marino with the crime in question and colored his first identification based "solely" on hearing Marino's voice.

The second identification was also in violation of the standards laid down by *Peyton*, supra, as it stemmed from the first identification. Moreover, Ma-

rino was directed by the police to speak so that he could be identified. He was not warned at that time that he could have counsel or that he need not speak at all. Hence, the second "voice" identification was not the product of happenstance, but rather of willful police conduct.

In addition, Marino who is a big fat man, was asked at the time of the second identification to appear in front of the complaining witness. But at that time the complaining witness knew that the person who threatened him was known as the "Big Man". Marino's appearance, therefore, may also have further colored what ostensibly was a pure voice identification. Indeed, Sgt. McLellan testified that at the time of Marino's arrest, "It was very funny because it was his size that attracted . . ." his attention. This led in part to Marino's arrest. [N.T. 715] Thus, "(w)hen [the complaining witness] was asked if [he] could identify the voice, the only voice that was submitted for identification, the highly suggestive atmosphere . . . could not have failed to affect his judgment." *Peyton* at 201.

Any distinction even if drawn between the two separate identifications which is based upon abuse of police power cannot be maintained. The two separate voice identifications cannot be separated as it is impossible to say that any later in court identification stemmed from the first identification and not from the second. Hence the police action in producing Marino for the second identification did not constitute harmless error.

Thus, Marino's girth, his talking about a "truckers' strike" and his conversation with an arresting officer and a co-defendant in an atmosphere which was highly suggestive that Marino was somehow involved in the crimes in question were prejudicial factors which may

have underlaid the complaining witness's identification of him. In addition, identification by the complaining witness was made of a voice which he heard previously only over the telephone. Such identification is inherently suspect due to the distortions which arise in voice transmittals through telephone cables. All of these factors were mixed in an unseemly gel which possibly gave rise to induced and mistaken voice identifications. Thus, in my opinion, the context in which the first and second voice identifications were made was improperly suggestive. "The opportunity for suggestion inherent in the procedure used to secure this identification is manifest." *Peyton v. Palmer,* supra at 201.

Marino after his arrest should not have been exposed or exhibited to the complaining witness except under the most antiseptic and neutral circumstances such as a random voice selection. This would ensure that Marino would not be pre-identified as having been involved in the crimes in question. Otherwise, the police atmosphere and close association of Marino with people already known to the complaining witness as having been involved in the crimes in question might color any subsequent voice identification by the complaining witness. Fundamental fairness dictates that extraneous factors whether they be an association with a co-defendant or the girth of a man should not be considered or even come to the attention of a complaining witness when a pure voice identification is made. It is the responsibility of the police to ensure that inadvertent violations of this principle do not occur as they are charged with the sole custody and responsibility for a suspect after his arrest. When the police fail in this duty, by design, negligence or inadvertence we must, in my opinion, reject the product of the breach.

It seems to follow that in all fairness, a voice comparison should be set up to prevent identification solely by suggestion.

In the case of *Commonwealth v. Derembeis*, 120 Pa. Superior Ct. 158, 182 A. 85 (1935), this Court discussed very carefully the value of voice identification and how it should be handled and said at page 166: "The established rule is that while the sound of the voice is a relevant circumstance to be considered on the question of identity, the value of such testimony depends, first, upon some peculiarity of the voice and second, the extent of the familiarity of the witness with the voice:". In that case the Commonwealth depended on the testimony of a victim who had been blinded by the perpetrators of the crime, and who identified the defendant by voice alone. A new trial was granted. In *Commonwealth v. Kumitis*, 167 Pa. Superior Ct. 184, 74 A. 2d 741 (1950), at page 189, this Court said: "If his conviction depended upon the testimony of Croop alone, who said that although he was not one of the three men who first entered the building he later recognized his voice because of its peculiar high pitch, although he had not heard it for 16 or 18 years, we would be constrained to sustain the assignment."

As no evidence other than the voice identifications was presented at trial which implicated Marino, I would direct a reversal of his conviction and order the lower court to enter a judgment of acquittal.

HOFFMAN, J., joins in this opinion.