**STATE of Missouri, Respondent,**

v.

**William Edgar BOSWELL, Appellant.**

**No. 53687.**

Supreme Court of Missouri,
Division No. 2.

Nov. 12, 1968.

---

Norman H. Anderson, Atty. Gen., Jefferson City, Timothy G. Noble, St. Louis, for respondent.

J. Arnot Hill, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.

PRITCHARD, Commissioner.

Appellant, who was convicted by the jury and sentenced by the court to ten years imprisonment for robbery in the first degree, asserts reversible error in one victim's in-court identification of appellant being "tainted by her prior identification from police photographs in violation of the right guaranteed by the Sixth Amendment .and the Fourteenth Amendment to the Constitution of the United States." The inquiry here is directed toward whether the procedure used by the police, in showing the victim three photographs which she identified as her assailants, was manifestly unfair, or whether there was an independent source for the in-court identification as would remove any claimed taint of misidentification.

The trial began on November 29, 1967. Della Marie Baird was dating Harry "Bud" Flanary on May 23, 1967, and in the early part of the evening, after they took Bud's father home, they drove up to Cliff Drive in northeast Kansas City, Missouri. They arrived about eleven o'clock, p. m. After they had been there about ten minutes, a car drove by and then came up from behind them again. There was a man in the back seat with a paper sack over his head who shot through the back window of the Flanary car. Della and Bud leaned down in the car seat. The man with the paper sack jumped out of the car alongside and pointed a gun down at them and told them to get out. Della and Bud got out. The man told Bud he wanted his car keys and the money he had on him, which Bud delivered, about $60. He then told Della to get into the car, and she got into the back seat. There were two other men in the front seat. The man with the paper sack took it off, handed the gun to another, and got into the back seat beside Della. He then gave the money, which he said was $40, to a man in the front seat who kept the gun pointed at Della. Apparently this man was appellant, but the facts are not clear at this point. They then drove to Sugar Creek, and Della was with the three

men in the car, which was stopped on an old closed road, close to two hours. Both the other men on separate occasions got into the back of the car with her. During the two hours the men did not attempt to hide their faces, and were in close proximity to her. They let her out near a cab stand in Fairmont. She went to her home and in a few minutes Bud came with the police. Later she attempted to identify the three who had taken her by photographs (about three drawers of them) at the police department, but there were no photographs there on them. The next day the police brought out three photographs for Della to view, and she identified all three of them: Goff, Newman and appellant, whom she pointed out in court, "The only difference he didn't have glasses on." "Q. Is there any doubt in your mind that this is the man that told the guy to give him the gun and the money? A. None whatsoever. Q. And is this the man that also got into the back seat with you on one occasion? A. Yes. Q. And this is the man you had an opportunity to view for two hours? A. Yes."

On cross-examination, Della's opportunity to observe her three abductors was developed more. When the other car pulled up alongside her and Bud, its occupants were visible but she couldn't tell what they looked like until she got in. She described the three men to the police: the one in the back seat was about twenty-three years of age and had sandy colored curly hair; the driver was a thin young boy with black hair; and the older man had gray hair, with a short crew cut, and a big nose. She recognized the driver after seeing his picture as someone she used to go to school with at William Chrisman High School. She remembered seeing his picture in the yearbook. There was not much light on Cliff Drive, but enough so one could see, like a shadow. There was no illumination in the car until they got out on Independence Avenue, then it was quite clear. She saw slides, some in color, at the police department but none of them resembled the three. The policeman brought three photographs (only) out the next day which she identified. "Q. They showed you three pictures only? A. Three pictures only. Q. And you said yes, these were the people that did it? Right? A. I took them over to the light and I looked at them and that was all three of them. Q. At the time that you were shown these three pictures that you identified as the persons that abducted you and robbed Mr. Flanary, were you shown any other pictures or just three pictures? A. Just three. I didn't need any more. That was them." Della had never been to a lineup. During the approximate twenty minutes it took to drive from Cliff Drive to Sugar Creek the gray haired man in the right front seat was turning around to look at her, and was talking to her. The policeman said to her that he had three pictures he wanted her to see about, to identify, and she looked at them and said they were the ones, and she asked him where he got them but he would not tell her. While Della was sitting in the back seat of the car, at the point they drove off down Cliff Drive, she could recognize the one boy very well and could give a good enough description of the other two that she knew what they looked like. "[N]ot much but enough that you can get a general idea of what they look like, but a lot better was when I was on the highway."

Harry Flanary testified substantially the same as Della as to the events of the evening of May 23, 1967. He could identify the one man, with a sack over his head, as the one who held a revolver on him (and took $60 from him). He could not identify the other two. The sack over the one man's face had big holes cut in it so it did not hide all his features. One of the men at the Grand Jury showed Bud three pictures and he picked out one. "Q. And you said, 'This is the person'? A. Right. I just wouldn't forget it because I could see his features, he was short, he was just a little bit shorter than I was, or just about my size, and he was kind of husky, and I just could—I could identify him. I know I can."

There was no objection to any of the identification evidence, although the point was presented in the motion for new trial. Appellant urges application of the plain error rule, Supreme Court Rule 27.20, V.A. M.R.

In the case of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, the F.B.I. had obtained photographs of one Andrews (whose conviction was reversed for lack of evidence) and Simmons from Andrews' sister. The photographs were shown to the five bank employees who had witnessed the robbery, and each identified Simmons from the photographs which were not introduced into evidence (as is the case here). Appellant's claim here is the same as that of Simmons (88 S.Ct. 970): "[H]e asserts simply that in the circumstances the identification procedure was so unduly prejudicial as fatally to taint his conviction. This is a claim which must be evaluated in light of the totality of surrounding circumstances. See Stovall v. Denno, 388 U.S. 293, at 302, 87 S.Ct. 1967, at 1972, 18 L.Ed. 2d 1199; Palmer v. Peyton, 4 Cir., 359 F. 2d 199." While the court did discuss the chance for error in witness identification of criminals in improper employment of photographs ("This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized" (88 S.Ct. 971 [1])), it rejected Simmons' contention as untenable. The court further commented that the procedure of identification by photographs has been widely and effectively used in criminal law enforcement, in apprehending offenders and in sparing innocent suspects from arrest through exoneration by eyewitness scrutiny of photographs. The court was unwilling to prohibit the employment of this procedure, and said (88 S.Ct. 971), "Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

There was nothing in the evidence here that the police officer's showing to Della the three photographs on the day following the offense was in any way suggestive that the three persons shown thereon were the culprits. Della had previously looked over a large number of photographs and slides at the police department. She had given the police a description of her abductors. And most importantly, identification of appellant in court was not based solely upon his photograph, but had an "independent source"—Della's opportunity to observe appellant in close proximity to her under sufficient lighting conditions for about two hours after the robbery was committed. She remained steadfast in that testimony of identification throughout the extensive cross-examination of her by appellant's counsel, as the record shows. (See Simmons v. United States, loc. cit. 88 S.Ct. 971 [2, 3].) The factual surroundings of this case show that the identification procedure used was not such as to deny appellant due process of law, and hence there was no plain error affecting appellant's substantial rights.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.