612 A.2d 1028

**COMMONWEALTH of Pennsylvania**

v.

**Anthony FIELDER, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 21, 1992.

Filed July 20, 1992.

456

Bernard L. Siegel, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com.

Before ROWLEY, President Judge, and BECK and HESTER, JJ.

ROWLEY, President Judge:

In this appeal from the judgment of sentence imposed following his conviction of murder in the first degree, Anthony Fielder raises three issues: 1) whether the trial court erred in allowing the Commonwealth to read into the record the prior, and allegedly hearsay, statement of a Commonwealth witness; 2) whether the trial court erred in permitting the Commonwealth to offer, in rebuttal, testimony that allegedly should have been introduced as part of the Commonwealth's case-in-chief; and 3) whether the conduct of the prosecutor was so inflammatory and prejudicial as to deny appellant a fair trial. After reviewing the record and considering the arguments of the parties, we affirm the judgment of sentence.

In his opinion dated July 1, 1991, the Honorable David N. Savitt summarized the facts concerning the homicide as follows:

On Saturday, September 23, 1989 at about 5:00 p.m. the victim, Jack Fauntleroy, was having an argument outside Skip's Bar at 52nd and Market Street [in Philadelphia] with a man named Stefan. Stefan then went into the bar and came out with the defendant Anthony Fielder who began arguing with the victim. After a few minutes Alfonso Goldsmith, a friend of the deceased, intervened on behalf of him and began to argue with the defendant. The argument came to blows and when Goldsmith began

to get the better of it the defendant left and went back into Skip's Bar. A few minutes later the defendant emerged from the bar with a .38 caliber handgun and fired it at the fleeing victim hitting him in [sic] once in the leg and once in the back causing his death.

On February 15, 1990, appellant voluntarily surrendered to the police in the offices of Chuck Stone, Senior Editor of the Philadelphia Daily News. On January 8, 1991, a jury found appellant guilty of first-degree murder and possession of an instrument of crime. Judge Savitt imposed a sentence of life imprisonment for the former offense and a concurrent sentence of one to two years imprisonment for the latter. Post-sentence motions were filed and denied, Judge Savitt reimposed both sentences, and this timely direct appeal followed.

 Appellant's first issue concerns the Commonwealth's attempt to rebut defense counsel's attack on the credibility of Commonwealth witness Alfonso Goldsmith by having Philadelphia Police Detective John Szymczak read into evidence portions of the statement given to him by Goldsmith several days after the homicide. On direct examination Goldsmith testified as follows: As he was getting off the elevated train or "el" at approximately 5:00 p.m. on September 23, 1989, he saw his friend Jack Fauntleroy "arguing with this guy named Stefan" on the corner of 52nd and Market Street. Stefan then went into a nearby bar and returned with appellant, known to Goldsmith as "Tone," who "started shoving Jack around." Goldsmith joined in the fight and hit appellant several times, at which point appellant and Stefan went back into the bar. Appellant then came out carrying a gun, and Goldsmith ran toward a delicatessen on the corner of 52nd Street. As he was running, he heard two shots, turned, and saw appellant chasing him with the gun in his hand. Goldsmith ran into the delicatessen and jumped behind a counter. After waiting there for ten or fifteen minutes, he returned to the scene of the altercation and saw Fauntleroy lying in the street, surrounded by a crowd of people.

As appellant explains in his brief, "It was an important part of the defense in the case to establish that it was as likely, if not more so, that the shooter was actually Alfonso Goldsmith ..." (Brief for Appellant at 15) rather than appellant. Before Goldsmith testified, the Commonwealth had called as a witness Latonia Shawver, who testified that she had seen the shooting as she waited for a bus. Although she had identified appellant as the shooter after seeing him in a lineup, it was a theory of the defense that her actual description of the shooter fit Goldsmith more closely than it fit appellant. Significantly, Shawver also testified that she had seen the shooter in a car shortly before the shooting took place.

In his cross-examination of Goldsmith, therefore, defense counsel focused on Goldsmith's appearance at the time of the shooting and also on the form of transportation that had brought him to the scene. When defense counsel asked Goldsmith, "When you arrived at the corner of 52nd and Market, you came in a car; didn't you?" Goldsmith replied, "No, I didn't." Defense counsel challenged Goldsmith's answer by reading the following portion of the statement that Goldsmith had given to Detective Szymczak on October 1, 1989:

Question: In your own words, tell me what happened leading up to the shooting of Fauntleroy?

Answer: I was getting out of a hack cab at the southeast corner of 52nd and Market. I saw Jack arguing with some black dude.

N.T. at 170. Goldsmith acknowledged that "that's what it says," that he had read Detective Szymczak's transcription of his statement before signing it, and that he had made no corrections to it. Nevertheless, he insisted that the statement quoted above was wrong because he had not arrived at the corner of 52nd and Market in a car, but rather on the el. He added that "[t]he hack is right there by the el but I didn't get out [of] the hack or no cab."

As his first witness defense counsel called Detective Szymczak, whom he questioned in pertinent part as follows:

Q: Did [Alfonso Goldsmith] tell you how it was that he arrived at 52nd and Market Street on September 23, 1989?

A: He did.

Q: What did he tell you?

A: I asked the question, in his own words, would he explain to me how he became aware of the death of Mr. Fauntleroy.

In his own words, in longhand, I wrote a statement. He told me that he arrived at 52nd and Market Street through a hack. At that point, I asked him what a hack was, and he said it was a cab, and that's how I distinguished what a hack was.

Q: After you had completed your interview of Mr. Goldsmith, in handwriting, did you show it to him to review?

A: I did.

Q: That's standard practice; isn't it?

A: Yes, sir.

Q: Did you tell him that he had the right to make corrections to anything that he read?

A: I did.

Q: Did he correct any aspect of what you just said about how he arrived; namely, in a cab?

. . . . .

A: No.

N.T. at 278–80.

The testimony that appellant now alleges was inadmissible hearsay occurred during Detective Szymczak's cross-examination by Assistant District Attorney Richard Sax, which we quote at length:

Q: Mr. Goldsmith told you he got out of a hack and was at the corner of 52nd and Market Street; is that correct?

A: That's correct.

Q: And did he tell you—he told you, it was at that point, that he saw Jack; is that correct?

A: That's correct.

Q: I would ask you to refer to the statement. Did he tell you what he saw Jack doing when he first saw Jack?

[Defense Counsel Bernard] Siegel: I object, your Honor. This is beyond the scope.

The Court: Well, I don't think it is. You asked him questions concerning the statement of a particular individual. I think the District Attorney can inquire further under those circumstances.

Mr. Siegel: I would simply note that the inquiry was limited to a particular aspect.

The Court: I understand, but that opens the door for the statement.

By Mr. Sax:

Q: Did he tell you what he saw Jack doing when he saw Jack?

A: Goldsmith stated that he saw Jack arguing with some black dude.

Q: Those were Mr. Goldsmith's words?

A: Yes.

Q: Did he tell you what that man's name was who [sic] he saw Jack arguing [with]?

A: Again, Goldsmith stated to me "I later learned his name was Stefan," and I spelled it STEFON.

Q: Did he tell you ... what they were arguing over or what he thought they were arguing over?

A: He thought that they were arguing—

Q: What were his words?

A: "I think they were arguing over a crap game or money. I stood and watched them."

Q: Did he tell you where Stefan went ...?

A: He did.

Q: Where did he tell you, in his words, where Stefan went?

A: "Then Stefan went into the bar, Skip's Bar, and right back out again, enough time to tell somebody something."

Q: Did he tell you anything about who came out of the bar?

A: "Stefan just stood there and Tone come out and got into Jack's face."

Q: Did Mr. Goldsmith tell you what, if anything, he, Mr. Goldsmith, did at that point in time?

A: He did. "That's when I got in Tone's face and told him to get out of Jack's face because he," referring to Jack, "was high."

"Tone hit me once, and I swung back. I hit him once or twice but I swung several times. He kept backing away. We was on the sidewalk, like between the two bars, Skip's and the Butterfly.

"Jack was there, like watching the boy Stefan."

Q: Did he tell you anything further about what he saw Tone do?

A: He did. He went on to say "Tone went into the bar," and in parenthesis, I put "Skip's Bar [" "] for about a minute or two, then come back out and stood in the doorway.

"I saw he had a gun in his left hand, down by his side."

He continued to say "I've been shot three different times, so I sees the gun and me and Jack run, and I heard two gunshots. Then I turned towards Tone and sees Tone pointing the gun and I ran. I ran down 52nd Street north and into a deli, which is located at 52nd and Filbert Streets.

"There was a bunch of dudes in the doorway of the deli, and I told them to get out of my way. I went in and jumped behind the counter.

"I turned a couple of times and Tone was on me and he still had the gun. That's why I went into the deli. If he hadn't been on me, I would have run down 52nd Street."

Q: By "down 52nd Street," did you understand him to mean continuing north?

A: Yes. I understood him to mean north when he directed my attention that way.

Q: Did he tell you how long he was in the Penn Deli and what he did upon leaving the Penn Deli?

A: He did. Continuing, "About five minutes later, I asked somebody in the restaurant, and they said the boy was gone, so I went back up to Market, and saw Jack laying on the street and the paramedic was there pushing on his chest.

"Jack didn't say anything to me. He was coughing. I heard, while I was in the deli, that the boy Stefan was stomping him while Jack was on the ground."

Q: Did you ask Mr. Goldsmith to look at any photographs?

N.T. at 281–85. At this point defense counsel objected, a sidebar discussion ensued, and the objection was sustained. Mr. Sax then continued his cross-examination of Detective Szymczak:

Q: Did you ask him who shot Jack?

A: I did.

Q: What was his answer?

A: That was the completion of the narrative. Then I began questions and answers. I did ask him. "Who shot Jack" was my question. His answer, his response was "Tone. Tone had the gun."

N.T. at 289.

Appellant concedes that a prior consistent statement may be used to rehabilitate a witness if the statement is limited to the specific subject matter on which the witness has been challenged during cross-examination. He contends, however, that because the portions of his statement read by Detective Szymczak, as quoted above, did not concern the mode of transportation by which he arrived at the scene of the homicide, evidence as to that portion of the statement

was hearsay not within any recognized exception, and its admission was error entitling him to a new trial.[1]

It is hornbook law that hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Packel & Poulin, Pennsylvania Evidence, § 801 (1987); *Commonwealth v. Smith,* 402 Pa.Super. 257, 268, 586 A.2d 957, 963 (1991). The material at issue consisted of out-of-court statements offered, as we infer from the record, to bolster Goldsmith's credibility in response to defense counsel's attempted impeachment by showing that the remainder of Goldsmith's statement was largely in accord with his trial testimony and by showing that Goldsmith's statement had been accurately told to and recorded by Detective Szymczak.

It has been suggested that when prior consistent statements are offered for the purpose of rehabilitating a witness whose credibility has been attacked, they are not hearsay. Packel & Poulin, supra, § 801.6; *Commonwealth v. Willis,* 380 Pa.Super. 555, 573, 552 A.2d 682, 691 (1988) (*en banc*) (plurality), *alloc. denied,* 522 Pa. 583, 559 A.2d 527 (1989). It has also been held, however, that such statements are hearsay and admissible only as an exception to the hearsay rule. *See Commonwealth v. Hutchinson,* 521 Pa. 482, 487, 556 A.2d 370, 372 (1989); *Commonwealth v. Griffin,* 511 Pa. 553, 568, 515 A.2d 865, 872 (1986), *cert. denied, Griffin v. Pennsylvania,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Havasy v. Resnick,* 415 Pa.Super. 480, ——, 609 A.2d 1326, 1332 (1992); *Commonwealth v. Smith, supra.*

We are persuaded that, regardless of how the evidence at issue is categorized, appellant has not shown that the admission of the evidence was improper. In *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980), our

1. We are aware that defense counsel's objection at trial did not include any assertion of hearsay, but consisted solely of the claim that the evidence which the Commonwealth sought to introduce was "beyond the scope" of his inquiry concerning Goldsmith's statement. Nevertheless, we will address appellant's hearsay argument in the interest of judicial economy.

Supreme Court considered a claim similar to that involved here. In that case Philadelphia Police Officers George Ghee and Milton McCall were assigned to transport appellant Jose Cruz to homicide headquarters after appellant claimed to have information concerning the murder two years earlier of one Dennis Bishop, who had been stabbed and strangled. En route appellant informed the officers that several years earlier he had grabbed a man around the neck while one Glenda Swift stabbed the man repeatedly with an ice pick. Appellant was later charged with the murder of Bishop. At trial Officer Ghee testified on direct examination that on the drive to headquarters appellant made an inculpatory statement, namely, that Swift stabbed Bishop so quickly that he (appellant) had to move his arm to avoid being stabbed himself. During cross-examination defense counsel established that Officer Ghee had given to Detective Floyd Gallo a statement about what appellant had said and that Ghee's statement did not include appellant's comment about moving his arm to avoid being stabbed. Over defense counsel's objection the trial court permitted the Commonwealth to read into evidence as a prior consistent statement Officer Ghee's entire statement to Detective Gallo. Appellant argued on appeal that the prior statement was inadmissible hearsay. The Supreme Court resolved the issue as follows:

It is well-established that a trial court may, in its discretion, permit introduction of a prior consistent statement of a witness in order to rebut a claim of recent fabrication in the witness's trial testimony. Here, by bringing out the fact that a portion of Officer Ghee's trial testimony was not contained in his statement to Detective Gallo, defense counsel clearly advanced recent fabrication. Therefore, it was not error for the court to permit the Commonwealth to rebut the claim of recent fabrication by introducing Officer Ghee's prior consistent statement. Moreover, since the statement at issue was first employed by defense counsel in an effort to impeach the Commonwealth's witness, the court properly exercised its

discretion in admitting the entire statement to show there was no inconsistency and no other difference between Officer Ghee's out-of-court statement and his trial testimony. *See Commonwealth v. Marino,* 213 Pa.Super. 88, 245 A.2d 868 (1968), *cert. denied,* 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771, *rehearing denied,* 396 U.S. 871, 90 S.Ct. 46, 24 L.Ed.2d 129 (1969).

*Id.* at 566, 414 A.2d at 1036 (additional citations omitted).

Similarly, in *Commonwealth v. Marino,* cited in *Cruz, supra,* appellants "demanded of the District Attorney every statement Singer [allegedly the victim of blackmail and extortion] had made and they used everyone [sic] to show he had made conflicting statements." *Id.* 213 Pa.Super. at 105, 245 A.2d at 876. This Court held that since parts of these statements had been disclosed through the efforts of appellants' counsel to discredit the witness, "the other portions relevant to the subject matter were admissible in their entirety" as prior consistent statements. *Id.* at 105, 245 A.2d at 876. We conclude that the same result is warranted in the present case, and that the trial court's ruling was not error.

■ Appellant's second issue concerns the trial court's decision to permit the Commonwealth to call a rebuttal witness. During its case in chief the Commonwealth, as noted above, presented evidence that appellant came out of Skip's Bar with a gun just before Fauntleroy was shot. To counter this evidence, the defense called George Manley, the manager of the bar. Manley testified that he had seen appellant on the day in question and that appellant was not carrying a gun, but that another man who came into the bar that day, whose name he did not know, was carrying a gun. On cross-examination Manley denied that appellant kept a gun behind the bar of Skip's Bar.

The prosecutor later informed the court that he intended to call as a rebuttal witness Tishira Fauntleroy, the victim's sister, who had just informed him that she had often seen appellant keep his gun in Skip's Bar. Fauntleroy had been sequestered during Manley's testimony. The court indicat-

ed that her testimony would be proper rebuttal, and defense counsel said, "I don't see how I can object." When trial resumed several days later, however, defense counsel indicated that in fact he did object to the proposed testimony because it was the type of evidence that should have been introduced in the Commonwealth's case in chief. The prosecutor responded by saying that he did not learn of the evidence until after the Commonwealth's case had been closed. The court observed:

Ordinarily, I would agree with you, Mr. Siegel. If the Commonwealth had this evidence before trial, it should be introduced as part of their case in chief, that they would be able to show a witness who saw a gun—well, I'm not even sure of that. Let me consider it.

N.T. at 349. At a later point the court said:

[M]y inclination is to permit the testimony, and I will explain why, but I'm not making that decision right this moment because it isn't ripe for decision, so ... if there's anything further either of you has to say on that subject, I'll hear you, and I will explain the reasons for my determination when and if it becomes necessary, and that's when the defense closes and the Commonwealth witness is, indeed, being called, and then you can renew your objection, Mr. Siegel, and it will be ripe for determination.

N.T. at 353.

After the defense rested, the Commonwealth called Tashira Fauntleroy, who testified that on many occasions she had seen appellant enter Skip's Bar, place a gun behind the bar near the cash register, and retrieve the gun when he left. On cross-examination she stated that she had given this information to a detective "[r]ight after my brother was killed," that she believed the information was included in the statement that she signed, and that she had not repeated it to the prosecutor, Mr. Sax, because she thought he would have seen the statement that she had given to the detective. After being shown her signed statement by defense counsel, she admitted that it contained no reference

to appellant keeping a gun in Skip's Bar. Defense counsel and the court then asked the witness additional questions concerning appellant's alleged practice of placing a gun behind the bar.

Appellant asserts that "the trial court had correctly determined to exclude the proposed rebuttal, and would have done so had the Commonwealth not incorrectly represented" (Brief for Appellant at 22) that it had not known of Fauntleroy's evidence in time to introduce it during its case in chief. As the Commonwealth points out in its brief, defense counsel never renewed his objection to Fauntleroy's testimony. Nevertheless, appellant's post-trial motions include the claim that the trial court erred in permitting the Commonwealth to introduce the evidence, and the trial court addressed the issue in its opinion of July 1, 1991.

Assuming for the sake of argument that the issue has been properly preserved, we conclude that it is without merit. The record does not support appellant's claim that the Commonwealth was aware of Fauntleroy's information prior to trial. Although Fauntleroy testified that she told the detective about appellant's habit of leaving his gun behind the bar, no such information is included in her signed statement. If in fact she gave such information to the police, the information was evidently not conveyed to the District Attorney's Office and knowledge thereof cannot be attributed to the prosecution. *See Commonwealth v. Bonacurso*, 500 Pa. 247, 251 n. 3, 455 A.2d 1175, 1177 n. 3 (1983), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3090 (1983) (where detective, considering witness's statements unimportant, did not include them in materials submitted to District Attorney's Office before trial, Commonwealth will not be held to have violated discovery rules by failing to provide statements, which it did not possess and of which it was unaware, to defense). On these facts, we conclude that appellant is not entitled to relief.

In his final issue, appellant argues that the prosecutor's conduct tainted the proceedings to the point that he did not receive a fair trial. Our Supreme Court recently discussed

the issue of prosecutorial misconduct in the context of a request for a new trial:

> Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. Rather, the focus is on what, if any, effects the comments had on the jury. A new trial is required when the effect of the [prosecutor's] comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Further, this decision is for the trial court to make. Our role is to determine solely whether the trial court abused its discretion.

*Commonwealth v. Faulkner*, 528 Pa. 57, 77, 595 A.2d 28, 39 (1991) (citations and internal quotation marks omitted).

■ Appellant first challenges the prosecutor's conduct in questioning the Commonwealth's own witness, Leon McRae, who was working in the delicatessen at the time of the shooting. McRae testified that two men had run into the delicatessen, one following the other, and that "as the [first] guy jumped over the counter, the other guy was walking out the door." He added that as the second man was leaving, "[h]e looked as if he was putting the gun away, you know, stuffing something in the back of his jacket...." Asked "Stuffing what in the back of his jacket?" the witness replied, "I think it was a gun." Defense counsel's objection to that reply was sustained, and additional objections were sustained as the prosecutor continued to ask questions about whether the witness had seen a gun. The prosecutor then asked the witness to review the statement that he had given to the police, and the following exchange took place:

Q: Didn't you tell the detective "Another guy came in behind him and the second guy was putting a gun somewhere in his back, like in his pants or something."

Didn't you tell the detective that? Yes or no.

A: Yes, I did.

Q: You did not say to the detective I think it was a gun, it looked like a gun, I'm not sure whether it was a gun.

Mr. Siegel: Objection.

By Mr. Sax:

Q: Did you?

Mr. Siegel: Objection.

The Court: I'm going to sustain that last question. In other words, that's what you said; is that correct?

The Witness: Yes.

The Court: You didn't say anything other than that.

The Witness: No.

The Court: You didn't tell the detective that you didn't actually see it?

The Witness: I told him exactly. I told him I didn't actually see it. I told him it looked, it appeared that he was putting the gun away.

N.T. at 224–25. The prosecutor returned to the same line of questioning on redirect. Taking these statements in context, and noting that it was the Commonwealth's own witness whose testimony was called into question, we conclude that the prosecutor's questioning of the witness was not so egregious as to prejudice the jury against appellant.

█ Appellant contends that the prosecutor's cross-examination of George Manley, the manager of Skip's Bar, was even more unprofessional. The prosecutor attempted to show Manley's favorable bias toward appellant, as the following exchange demonstrates:

Q: Within minutes after closing the door, Jack Fauntleroy is lying shot in the back twice—

Mr. Siegel: Objection.

The Court: Sustained. Stop that. Stop that.

Mr. Sax: I'm asking him a question.

The Court: Stop that. You are not asking the witness questions the way a lawyer in a court of law should do it.

Mr. Sax: It's cross examination, Judge.

The Court: Now, look. Don't start an argument with me. That's an improper question. That's the way you might

hear it done on some T.V. station. That's not the way it's done here and don't—

Mr. Sax: I don't watch TV, Judge.

The Court: You may argue when the time comes to argue. You may ask this witness questions in a respectful way.

. . . . .

Q: You also found out that the word all around was that Tone [appellant] had did the shooting, right?

Mr. Siegel: Objection.

The Court: Sustained. Now, don't do that.

Mr. Sax: Don't do what, ask questions?

The Court: Because that's clearly hearsay and it is clearly inappropriate, what he might have heard in the community. Now, stop it. You are getting very close to a mistrial. Stop it.

. . . . .

Q: Did you ever find out that it was the defendant, the person who [sic] you had seen hundreds of times inside your bar who was involved in any way in this murder?

Mr. Siegel: Objection. That's the point of this trial.

The Court: Sustained. Sustained. Now go on.

Mr. Sax: Did you find out or not?

The Court: Sustained. It's not important. It's not relevant.

N.T. at 312–16. The prosecutor's continual asking of improper questions eventually led the court to admonish him, in a conference held outside the hearing of the jury, that his actions were disrespectful to the court and that he was coming close to a mistrial.

We do not agree with the Commonwealth's assertion that "[t]he prosecutor's questioning, designed to demonstrate Mr. Manley's protection of his friend, was proper advocacy" (Brief for Appellee at 15). However, as the trial court points out, "[a]lthough these questions were improper the objections to them [were] sustained by this court and they remained unanswered" (Trial Court Opinion at 3). In addi-

tion, the court instructed the jury that only the witness's answers, not the questions asked of him, constitute evidence. We are satisfied that the court's actions were sufficient to prevent the prosecutor's conduct from prejudicing the jury.

■ Finally, appellant alleges misconduct by the prosecutor in the following portion of his closing argument:

Goldsmith, the shooter? Put Alfonso Goldsmith in the lineup if any of you think Alfonso had anything to do with the shooting of Jack Fauntleroy. This is not about Japanese movies and Stefan not being present.

Now, wait a second. I'm not suggesting the defense has any burden to do anything here but Stefan is the defendant's associate, not Jack's or not Nike's [Alfonso Goldsmith's].

Mr. Siegel: Objection.

The Court: The objection is sustained. No witness must be called by either side and you cannot draw an unfavorable inference against either side by the failure to call a particular witness.

N.T. at 546–47. Appellant argues that "[t]he clear import of this improper remark was to state that the person referred to as 'Stefan' was someone who could clear the Defendant, and to ask why the defense had not called him" (Appellant's Brief at 33). Appellant notes that one of the questions asked by the jury during the course of their deliberations was "Was Stefan ever located[?]."

Although the trial court sustained defense counsel's objection to the prosecutor's remark about Stefan, the court states in its opinion that none of the prosecutor's closing remarks was improper. We agree that the remark at issue here was not improper. During his closing argument defense counsel referred to Stefan as follows:

Mr. Manley as well as Mr. Goldsmith talked about a gentleman by the name of Stefan.... We haven't seen him. We certainly haven't seen him in this courtroom. We don't know what he looked like and how he was

dressed, but from what you heard, he certainly had an axe to grind against Mr. Fauntleroy as well.

N.T. at 494. It is evident, therefore, that in mentioning Stefan the prosecutor was merely responding to defense argument, as is proper. *See Commonwealth v. Kelly*, 319 Pa.Super. 204, 211, 465 A.2d 1301, 1304 (1983). We conclude that appellant's claims of prosecutorial misconduct, taken singly or together, do not entitle appellant to a new trial.

Judgment of sentence affirmed.